**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| KESSEV TOV, LLC, | ) | Case No. 20-cv-04947 |
| Plaintiff, | ) | |
| v. | ) | |
| JOHN DOE(S), | ) | |
| Defendants. | ) | |
| | ) | |
| PAJOJE DEVELOPMENT, LLC, | ) | |
| Plaintiff, | ) | Case No. 20-cv-04948 |
| v. | ) | Judge Sharon Johnson Coleman |
| JOHN DOE(S), | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are three motions to dismiss pending in related cases—two in *Kessev Tov, LLC v. John Doe(s)*, Case No. 20-cv-04947 (Dkts. 28 and 30) and one in *Pajoje Development, LLC v. Doe(s)*, Case No. 20-cv-04948 (Dkt. 36). Given the substantial overlap between issues raised in the motions, the Court addresses them all in this opinion.

Plaintiffs Kessev Tov, LLC ("Kessev Tov") and Pajoje Development, LLC ("Pajoje") (collectively "Plaintiffs") have each brought a two-count amended complaint against certain John Doe defendants alleging violations of Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78j(b) and Rules 10b-5(a) and (c) promulgated thereunder, as well as the Illinois Securities Law of 1953 ("ISL"), 815 ILCS § 5/12. Specifically, both complaints allege

that the John Doe defendants engaged in a scheme to manipulate the S&P 500 options market traded on the Chicago Board Options Exchange on August 24, 2015. Kessev Tov and Pajoje allege that John Does A and D carried out the manipulation scheme alleged in their complaints. Kessev Tov has also sued a third defendant, John Doe B.[1]

Defendant John Does A and D have filed identical motions to dismiss in each case. Their motions seek to dismiss the amended complaints on multiple grounds, including that (1) Plaintiffs' claims are untimely; (2) Plaintiffs fail to state a claim for market manipulation; and (3) Plaintiffs' ISL claims fail for additional reasons, including that Plaintiffs do not allege that they purchased any securities from the defendants and are therefore ineligible for the ISL's remedies. Defendant John Doe B filed its own motion to dismiss Kessev Tov's amended complaint, arguing that Kessev Tov has failed to state a manipulation claim based on largely the same arguments as those put forth by the other defendants. For the reasons explained below, the motions to dismiss (Dkts. 28 & 30 in Case No. 20-cv-04947) and (Dkt. 36 in Case No. 20-cv-04948) are granted without prejudice in both cases.

**Background**

The following facts are taken as true for the purpose of ruling on this motion. Kessev Tov and Pajoje are hedge funds that trade in, among other things, weekly S&P 500 options traded on the Chicago Board Options Exchange ("CBOE"). Trading at the CBOE occurs on an electronic trading platform, which displays current "bid" and "ask" prices for all options. The best available bid is the highest available price for buy orders in the market; the best available ask is the lowest available price for sell orders. Parties who enter orders at the "market midpoint" place those orders at the midpoint between the bid and the ask.

On the morning of August 24, 2015, the stock market opened down sharply. Within the

---

[1] The term "Defendants" refers to all three defendants—John Does A, B, and D.

first five minutes of trading, the Dow Jones Industrial Average dropped over 5%. As a result, trading in many stocks was delayed and the prices of several stocks declined rapidly. This market activity, known as a "flash crash," caused dislocation within the S&P 500 options market. There was no bid or ask information for many S&P 500 options for significant periods within the first fifteen to twenty minutes of trading that morning.

According to the amended complaints, this "flash crash" set the stage for Defendants[2] to engage in a form of market manipulation known as "spoofing." This involved placing simultaneous bid and ask orders that Defendants did not intend to execute (the "Deceptive Orders"). The complaints allege that Defendants would enter the orders, only to cancel them within milliseconds, thereby ensuring that the orders could impact other market participants without ever executing. The complaints further allege that these Deceptive Orders created an artificial appearance of market demand, which in turn induced a reaction from other market participants. Specifically, Plaintiffs claim that the Deceptive Orders created a false "market midpoint"—a price well outside of the "rational price" for the options Plaintiffs were trading—and induced market participants like Plaintiffs who placed market midpoint orders to place orders to close their positions at artificially inflated prices.

Kessev Tov alleges that Defendant John Doe B's spoofing bids caused it to receive a "margin call" that morning. Specifically, Kessev Tov alleges that pricing signals sent by John Doe B's spoofing bids signaled that Kessev Tov's portfolio was suddenly worth dramatically less. Kessev Tov alleges that, because it maintained a margin balance in its account, the decrease in value created by the spoofing bids caused Kessev Tov to fall into a margin deficiency, and Kessev Tov received a margin call at 8:30:34 a.m. Kessev Tov alleges that Defendant John Doe B's spoofing bids were the

---

[2] Plaintiffs do not know the names of the John Doe defendants because trading on the CBOE platform is anonymous. The parties agreed that the Doe defendants could remain anonymous unless and until Defendants' motions to dismiss were denied.

only bids in the market for the positions held by Kessev Tov prior to the margin call. To correct the margin deficiency, Kessev Tov alleges that it was then forced to enter orders to close its options. In the process of closing out its positions by placing market midpoint orders, Kessev Tov claims it fell victim to two additional spoofing bidders, John Does A and D. Kessev Tov alleges that those defendants' spoofing bids caused it to execute orders "at values highly distorted from the rational market." (Case No. 20-cv-04947, Dkt. 25 at 10, ¶ 28.) Pajoje alleges that John Does A and D's spoofing bids also caused it to purchase contracts to close its positions at prices "far in excess of the rational prices for the option contracts at issue based upon their fundamental characteristics, and also in excess of the prices that prevailed following the cessation of Defendants' spoofing activity." (Case No. 20-cv-04948, Dkt. 24 at 24, ¶ 53.)

Plaintiffs ultimately filed suit in two cases—one brought by Kessev Tov (20-cv-04947) and the other brought by Pajoje (20-cv-04948). The following month, Pajoje moved for expedited discovery, seeking to serve a subpoena to identify the John Doe bidders involved in the market manipulation alleged in the lawsuits. The Court granted the motion,[3] and the Chicago Board Options Exchange, Inc. ("CBOEI"), which operates the CBOE, agreed to produce the data with the bidders' identities masked. In analyzing the data, Plaintiffs determined that three bidding firms— John Does A, B, and D—had placed the alleged spoofing orders. Plaintiffs requested that the CBOEI reveal the firms' identities, and the CBOEI advised that it wanted to first notify the firms and give them an opportunity to appear and object. Thereafter, counsel for John Does A and D, as well as separate counsel representing John Doe B, contacted counsel representing both Kessev Tov and Pajoje, and the parties ultimately agreed that Defendants could proceed anonymously until the instant motions were decided.

---

[3] This motion was granted by Judge Shah when the *Pajoje* case was before him. This Court later reassigned the *Pajoje* case to it after finding the two cases to be related.

All of the defendants have moved to dismiss for failure to state a manipulation claim. Defendant John Does A and D additionally move to dismiss on timeliness grounds and claim that Plaintiffs' ISL claims fail for additional reasons.

**Legal Standard**

A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim tests the sufficiency of the complaint, not its merits. *Skinner v. Switzer*, 562 U.S. 521, 529, 131 S. Ct. 1289, 179 L. Ed. 2d 233 (2011). When considering dismissal of a complaint, the Court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) (per curiam). To survive a motion to dismiss, a plaintiff must "state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). A complaint is facially plausible when the plaintiff alleges "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

Because Plaintiffs' Section 10(b) and ISL claims sound in fraud, they must also meet the heightened pleading requirements of Rule 9(b). *Last Atlantis Cap. LLC v. Chi. Bd. Options Exchange, Inc.*, 455 F. Supp. 2d 788, 793 (N.D. Ill. 2006) (Bucklo, J.) ("[B]oth SEC Rule 10b-5 and Fed. R. Civ. P. 9(b) require that plaintiffs plead these claims of fraud with particularity.") (citing *In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 280–81 (7th Cir. 1996)); *ABN AMRO, Inc. v. Cap. Int'l Ltd.*, 595 F. Supp. 2d 805, 831 (N.D. Ill. 2008) (Dow, J.) (state fraud claims must comply with Rule 9(b)). In alleging fraud, the plaintiff "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). According to the Seventh Circuit, "[t]his means the who, what, when, where, and how" of the alleged fraud. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).[4]

---

[4] Some courts have noted that "the exact pleading requirements for a cause of action under Section 10(b) vary depending

The Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b) ("PSLRA") imposes further pleading requirements on § 10b-5 claims. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313–14, 320–21, 127 S. Ct. 2499, 168 L.E.2d 179 (2007). Section (b)(2) of the PSLRA requires a plaintiff asserting a manipulation claim under subsections (a) and (c) of Rule 10(b)-5, as here, to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each manipulative act performed. 15 U.S.C. § 78u-4(b)(2).

**Discussion**

*Statutes of Limitations and Repose*

Defendant John Does A and D argue that Plaintiffs' Section 10(b) and ISL claims should be dismissed because they are untimely under the applicable statutes of limitations and repose. The Court begins with these arguments.

Claims under Section 10(b) of the Exchange Act are subject to the limitations and repose periods provided in 28 U.S.C. § 1658(b). *Howe v. Shchekin*, 238 F. Supp. 3d 1046, 1050 (N.D. Ill. 2017) (Lee, J.) (citing *Merck & Co. v. Reynolds*, 559 U.S. 633, 638, 130 S. Ct. 1784, 176 L.E. 2d 582 (2010)). "Section 1658(b) requires that a cause of action be brought within two years after discovery of facts constituting the violation (*i.e.*, the statute of limitations), or five years after the violation (*i.e.*,

---

on the type of claim alleged." *See U.S. Commodity Futures Trading Comm'n v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1011 (N.D. Ill. 2015) (Blakey, J.). Claims under Section 10(b) can include: (1) fraud by misrepresentation or omission; and (2) fraudulent manipulation. *Id.* (citations omitted). The latter often does not involve any specific misstatement or misrepresentation, but instead involves misleading or cheating the market through action. *Id.* Some courts have concluded that, although manipulation claims based on market behavior also require fraud, they may not be subject to Rule 9(b) in exactly the same way as a misrepresentation claim (*i.e.*, they can be alleged with less specificity). *Id.* at 1011–12 (relying in part on *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101–02 (2d Cir. 2007), where the court noted that although market manipulation claims "must be pled with particularity under Rule 9(b)," because such claims "can involve facts solely within the defendant's knowledge . . . the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim" at the early stages of litigation); *see also Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1056–57 (N.D. Ill. 2016) (Chang, J.) (noting that, "for manipulation based on market activity rather than overt misrepresentations, there is some support for the conclusion that Rule 8(a) could apply, depending on the specific facts," though ultimately declining to decide whether such claims "must always be subject to Rule 9(b) in precisely the same way as a misrepresentation case").

the statute of repose)." *Id.* (citing 28 U.S.C. § 1658(b)). Additionally, securities claims under the ISL carry a three-year statute of limitations. 815 ILCS § 5/13(D).

First, Defendant John Does A and D claim that Plaintiffs' Section 10(b) and ISL claims are barred by the applicable statutes of limitations. The two-year period for bringing a Section 10(b) claim is triggered once the plaintiff "discovers, or could have discovered with reasonable diligence, the facts underlying the violation," whichever comes first. *CP Stone Fort Holdings, LLC v. John Doe(s)*, Case No. 16 C 4991, 2016 WL 5934096, at *3 (N.D. Ill. Oct. 11, 2016) (Gettleman, J.) (hereinafter, "*CP Stone I*") (citing *Merck*, 559 U.S. at 633, 646–48)). Plaintiffs' securities claims under the ISL carry a three-year statute of limitations, beginning on the date of the security's sale. 815 ILCS § 5/13(D). "But if the party suing neither knew nor in the exercise of reasonable diligence should have known of any alleged violation of the Illinois securities law, the three-year period to sue for Illinois securities law claims begins to run [on] the earlier of: (1) the date upon which the party bringing the action has actual knowledge of the alleged violation of this Act; or (2) the date upon which the party bringing the action has notice of facts which in the exercise of reasonable diligence would lead to actual knowledge of the alleged violation of this Act." *Orgone Cap. III, LLC v. Daubenspeck*, 912 F.3d 1039, 1046 (7th Cir. 2019) (quoting 815 ILCS § 5/13(D)(1)–(2)) (emphasis omitted).

A statute of limitations is an affirmative defense. Fed. R. Civ. P 8(c)(1). "In ruling on a motion to dismiss pursuant to Rule 12(b)(6), a district court should not require a plaintiff to 'anticipate or overcome affirmative defenses such as those based on the statute of limitations.'" *Howe*, 238 F. Supp. 3d at 1049 (quoting *O'Gorman v. City of Chi.*, 777 F.3d 885, 889 (7th Cir. 2015)). "As a result, the Seventh Circuit has often held that Rule 12(b)(6) is not designed for motions under Rule 8(c)(1)." *CP Stone I*, 2016 WL 5934096, at *3 (quoting *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012)). "Nonetheless, 'if it is plain from the complaint that the statute of limitations defense is

indeed a bar to the suit dismissal is proper without further pleading.'" *Id.* (quoting *Jay E. Hayden Foundation v. First Neighbor Bank, N.A.*, 610 F.3d 382, 383 (7th Cir. 2010)). A motion to dismiss for a statute of limitations violation is treated as a motion for judgment on the pleadings under Rule 12(c). *Orgone Cap. III, LLC v. Daubenspeck*, No. 16 C 10849, 2017 WL 3087730, at *9 (N.D. Ill. July 20, 2017) (Pallmeyer, J.); *CP Stone I*, 2016 WL 5934096, at *3 (explaining that dismissal for a statute of limitations violation "should be on the pleadings under Rule 12(c), but that amounts to the same thing as a dismissal under Rule 12(b)(6)") (internal quotations and citation omitted). Unless the complaint alleges facts that establish "an ironclad defense," a limitations argument "must await factual development." *CP Stone I*, 2016 WL 5934096, at *3 (quoting *Foss v. Bear, Sterns & Co.*, 394 F.3d 540, 542 (7th Cir. 2005)).

The amended complaints allege that the defendants' market manipulation occurred on August 24, 2015. Defendant John Does A and D argue that if Plaintiffs had been reasonably diligent, they would have discovered all of the alleged conduct on that day, and thus they violated the statutes of limitations for their Section 10(b) and ISL claims by waiting nearly five years to initiate these lawsuits. Defendant John Does A and D further argue that, as of August 24, 2015, Plaintiffs knew virtually all of the information on which their claims are based, including that: (1) unknown market participants had submitted bids and asks at prices that Plaintiffs believed to be far in excess of rational prices and higher than prices at any other time that day; and (2) Plaintiffs had purchased options at prices they believed were artificially inflated by spoofing trades. Defendant John Does A and D contend that only the identity of the alleged culprits was unavailable in August 2015, and that was not a legitimate reason to delay the filing of the complaints until after the limitations periods had expired.

Plaintiffs deny that they were aware of the defendants' spoofing bids in August 2015, claiming that the bids were effectively invisible because they were only in the market for a matter of

milliseconds.  Beyond the short duration of the bids, Plaintiffs note that the bids did not show up on their trade confirmations or statements because they had exited the market by the time that Plaintiffs' trades were executed.  While Plaintiffs recognize that they were aware of their losses in August 2015, they maintain that the cause was unknown to them.  In support, Plaintiffs note that Kessev Tov initially brought a FINRA arbitration against Plaintiffs' broker, because Plaintiffs thought that their damages had been caused by flaws in the broker's trading platform.  It was only after the arbitration concluded that Plaintiffs realized other market participants could have been responsible, and thereafter obtained the "tick-by-tick" trading data revealing the alleged spoofing bids.  (Case No. 20-cv-04947, Dkt. 34 at 10–11; Case No. 20-cv-04948, Dkt. 39 at 10–11.)  Plaintiffs deny that a reasonable market participant (1) could have known in August 2015 that unknown market participants were submitting bids and asks at irrational prices; or (2) should be expected, absent knowledge of fraud, to have obtained and scoured the "tick-by-tick" trading data to determine whether unknown market participants had defrauded them.

The Court finds that the allegations in the amended complaints do not create an "ironclad" limitations defense warranting dismissal.  That Plaintiffs were aware of their losses in the aftermath of the August 24, 2015 trading activity does not establish that Plaintiffs were aware, or should have been aware through reasonable diligence, that those losses stemmed from the alleged market manipulation of other market participants.  It is simply not clear from the complaints that the applicable statutes of limitations are a bar to these suits.  Defendant John Does A and D's motion to dismiss on this ground is denied.

Defendant John Does A and D next argue that Plaintiffs' Section 10(b) claims are barred by the Exchange Act's five-year statute of repose.  28 U.S.C. § 1658(b).  There is no dispute that Plaintiffs filed their original complaints asserting Section 10(b) claims within five years of the alleged market manipulation on August 24, 2015.  Defendant John Does A and D argue, however, that

Plaintiffs' Section 10(b) claims are untimely because the original complaints did not name the John Doe defendants, and any future amended complaint naming them will be time-barred. Specifically, Defendant John Does A and D claim (1) the relation back doctrine does not apply to the statute of repose; and (2) Rule 15(c) permits relation back only for a "mistake concerning the proper party's identity," and naming a "John Doe" defendant does not constitute such a mistake.

Plaintiffs respond that Defendant John Does A and D's relation back argument is premature. Nonetheless, Plaintiffs contend that a future amended complaint is not doomed by substituting party names for John Does. Plaintiffs note that the defendants accepted service of the complaints within the timeframe contemplated under Rule 4(m) (including court-approved extensions) and have since actively participated in these lawsuits. Thus, Plaintiffs argue that Defendant John Does A and D cannot claim that they were unaware of the complaints on which they waived service and subsequently appeared in the cases.

As discussed above, Plaintiffs brought their original complaints on August 23, 2020. The following month, Pajoje moved for expedited discovery and served a subpoena on CBOEI in order to identify the John Doe bidder(s) involved in the alleged spoofing scheme. Counsel for CBOEI accepted service of the subpoena and the parties negotiated the scope of the production. While the parties remained engaged in negotiations, and before the deadline for the service of the complaint had passed, Plaintiffs each moved for and received an extension of time to serve the complaint in November 2020. The parties ultimately agreed that CBOEI would produce the data with the bidders' identities masked, and CBOEI produced the data. After analyzing the data and determining that three bidding firms placed the alleged spoofing orders, Plaintiffs requested that CBOEI reveal their identities. CBOEI notified the firms to give them a chance to appear and object. Counsel for Kessev Tov and Pajoje was then contacted by counsel for the defendants, who indicated that the defendants intended to appear. Plaintiffs moved for and received a second extension of time to

serve the complaint in January 2021. The Doe Defendants waived service in early February 2021.

Pajoje filed an amended complaint on February 22, 2021 and, after the Court found the cases to be

related, Kessev Tov filed its amended complaint on May 7, 2021. The instant motions to dismiss

followed.

Rule 15(c)(1)(C) provides that

> [a]n amendment to a pleading relates back to the date of the original
> pleading when . . . the amendment changes the party or the naming
> of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is
> satisfied and if, within the period provided by Rule 4(m) for serving
> the summons and complaint, the party to be brought in by
> amendment: (i) received such notice of the action that it will not be
> prejudiced in defending on the merits; and (ii) knew or should have
> known that the action would have been brought against it, but for a
> mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1)(C).

Like the statute of limitations, the statute of repose is an affirmative defense that the

defendant must typically plead and prove. *CP Stone I*, 2016 WL 5934096, at *3 (citations omitted).

Also like the statute of limitations, statute of repose decisions at the motion to dismiss stage are only

appropriate where the issue is crystal clear. *Id.* This is not such a case. The prototypical John Doe

case generally involves a scenario where a plaintiff sues a John Doe defendant because he does not

know who harmed him, and the defendant is unaware of the lawsuit. *See Herrera v. Cleveland*, 8 F.4th

493 (7th Cir. 2021) ("knowingly suing a John Doe defendant" is not a Rule 15(c) "mistake" in the

context of a § 1983 claim). Such cases are distinguishable from this case, however, in that the

defendants were served within the timeframe provided under Rule 4(m), including approved

extensions, were in contact with Plaintiffs' counsel prior to the filing of the first amended

complaints, and appeared before the filing of those complaints (or two days after in the *Pajoje* case).

In essence, this case does not implicate "unknown" John Does, who might be surprised to find

themselves in litigation long after the expiration of a statute of repose, but rather "unnamed" John

11

Does, who have been participating in the case and in fact requested the anonymity. This difference is enough to abstain from deciding the issue at the motion to dismiss stage.

*Failure to State a Claim*

Defendants argue that Plaintiffs have failed to state a claim for market manipulation under Section 10(b) of the Exchange Act and the ISL.[5]

Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). The SEC's implementing regulation, Rule 10b-5, further clarifies that it is unlawful, in connection with the purchase or sale of any security, to "employ any device, scheme, or artifice to defraud" or "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5(a), (c). To state a claim for market manipulation, Plaintiffs must allege "(1) manipulative acts, (2) damage, (3) caused by reliance on an assumption of an efficient market free of manipulation, (4) scienter, (5) in connection with the purchase or sale of securities, (6) using the mail or any national securities exchange facility." *In re Chi. Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*, 390 F. Supp. 3d 916, 928–29 (N.D. Ill. 2019) (Shah, J.) (citing *ATSI Comm'ns*, 493 F.3d at 101). Defendants claim that Plaintiffs have failed to sufficiently allege manipulative acts, scienter, and loss causation.

<u>Manipulative Acts</u>

---

[5] Defendants correctly note that courts look to federal securities law in interpreting the ISL, which Plaintiffs do not dispute. Count II of each amended complaint is based on subsections (F) and (I) of § 12 of the ISL. Subsections (F) and (I) provide that it is unlawful "[t]o engage in any transaction, practice or course of business in connection with the sale or purchase of securities which works or tends to work a fraud or deceit upon the purchaser or seller thereof" and "[t]o employ any device, scheme or artifice to defraud in connection with the sale or purchase of any security, directly or indirectly." 815 ILCS 5/12(F), (I). These subsections "largely mirror the fraud provisions of the federal Rule 10b-5." *Gandhi v. Sitara Cap. Mgmt., LLC*, 689 F. Supp. 2d 1004, 1013 (N.D. Ill. 2010) (Gottschall, J.) (comparing 815 ILCS § 5/12(F), (G), and (I) with 17 C.F.R. § 240.10b-5).

The Court first considers whether the manipulative acts allegations are sufficient. The Supreme Court has explained that "'[m]anipulation' is virtually a term of art when used in connection with securities markets." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476, 97 S. Ct. 1292, 51 L.E.2d 480 (1977) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199, 96 S. Ct. 1375, 47 L.E.2d 668 (1976)). The term "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Hochfelder*, 425 U.S. at 199. Put differently, the term "refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity.'" *Santa Fe Indus.*, 430 U.S. at 476. "The gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *DH2, Inc. v. Athanassiades*, 404 F. Supp. 2d 1083, 1092 (N.D. Ill. 2005) (St. Eve, J.) (quoting *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999)); *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 862 (7th Cir. 1995) ("market manipulation" refers to "tactics by which traders, like monopolists, create artificially high or low prices, prices that do not reflect the underlying conditions of supply and demand") (citation omitted).

In determining whether market activity falls outside the "natural interplay of supply and demand," courts generally consider "whether a transaction sends a false pricing signal to the market." *ATSI Comm'ns*, 493 F.3d at 100; *see also Sullivan*, 47 F.3d at 861 (explaining that the central objective of the federal securities laws is "to prevent practices that impair the function of stock markets in enabling people to buy and sell securities at prices that reflect undistorted (though not necessarily accurate) estimates of the underlying economic value of the securities traded"). Courts must differentiate between "legitimate trading strategies intended to anticipate and respond to prevailing market forces and those designed to manipulate prices and deceive purchasers and sellers." *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 205 (3d Cir. 2001). To differentiate

13

between manipulative conduct and legal conduct, in the *Colkitt* case the Third Circuit looked to whether "the alleged manipulator injected 'inaccurate information' into the market or created a false impression of market activity." *Id.*; *see also In re Olympia Brewing Co. Sec. Litig.*, 613 F. Supp. 1286, 1292 (N.D. Ill. 1985) (Getzendanner, J.) ("Regardless of whether market manipulation is achieved through deceptive trading activities or deceptive statements as to the issuing corporation's value, it is clear that the essential element of the claim is that *inaccurate* information is being injected into the marketplace.").

Defendants argue that Plaintiffs' manipulation claims fail because the amended complaints do not adequately allege that the defendants injected inaccurate information into the market. In particular, Defendants contend that the complaint allegations—*e.g.*, Defendants lured Plaintiffs into executing orders "well outside the rational price" for options and "sent false pricing signals to the market"—are conclusory. Furthermore, Defendants contend that even where Plaintiffs do allege facts or provide specific examples, those examples broadly allege only that Defendants cancelled several trades during a period of market volatility, and Plaintiffs' orders were executed at prices higher than prices that existed later in the day.

Plaintiffs do not dispute that they must allege that the defendants injected inaccurate information into the market. They maintain that the complaint allegations "suggest that the Defendants' scheme 'injected inaccurate information into the market' because the Defendants had no intention of executing the orders they entered, as is evident from the fact that the Defendants cancelled their orders before they could have been executed." (Case No. 20-cv-04947, Dkt. 34 at 17 & Dkt. 35 at 9; Case No. 20-cv-04948, Dkt. 39 at 17.)

Defendants also argue that the amended complaints lack the traditional hallmarks of spoofing, which include: placing a large order (that a trader does not intend to fill) on one side of the market and a small order (that the trader does intend to fill) on the other, as in *United States v. Coscia*,

866 F.3d 782, 787 (7th Cir. 2017); or placing orders behind larger orders to ensure that they will not

be filled, as in *U.S. Commodity Futures Trading Commission v. Oystacher*, 203 F. Supp. 3d 934, 942 (N.D.

Ill. 2016) (St. Eve, J.). Here, Defendant John Does A and D note that the at-issue bids and asks

were relatively small and remained unchanged or very similar and the prices of the bids and asks

consistently declined, which they claim indicates that they were simply updating their prices in light

of declining market conditions during the flash crash. In addition, Defendants assert that the

complaints do not allege that Defendants in fact entered into trades that would have benefited from

the new midpoint prices—only that they *could* have done so. Nor do the complaints otherwise allege

how Defendants profited from the allegedly manipulated prices. Defendants claim that the failure

to allege that they benefitted from the allegedly manipulated prices, or to allege a motive for driving

up prices on which they did not execute, dooms Plaintiffs' claims.

For their part, Plaintiffs concede that they have not alleged that Defendants' orders were

placed behind larger orders. Indeed, the amended complaints allege that, at the time of the alleged

spoofing, there were no other orders in the market beyond those entered by the defendants, so there

could not have been layering. Rather, Plaintiffs maintain that Defendants ensured their orders

would not be executed by "minimizing the duration of the orders." (Case No. 20-cv-04947, Dkt. 34

at 22 & Dkt. 35 at 13; Case No. 20-cv-04948, Dkt. 39 at 22.) Plaintiffs claim that they are not

required to have alleged that the defendants actually entered into trades that would benefit from the

new midpoint prices. Plaintiffs, maintain, however, that they have alleged what the advantage to

Defendants was: Defendants' spoofing scheme induced other market participants, like Plaintiffs, to

place midpoint orders at artificial prices, "which the Defendants could then trade on." (*Id.*)

Finally, Defendants argue that the market activity described in the amended complaints

amounts to nothing more than legitimate trading activity. Defendants argue that the alleged trading

activity merely reflects rapid algorithmic trading, including the swift cancellation of orders, which is

both lawful and commonplace in today's markets. Indeed, Defendants note that, according to SEC data, approximately 80 to 100 orders are cancelled for each order that results in a trade. Additionally, Defendants claim that the entry of simultaneous bid and ask quotes is not improper and is consistent with "market making" activity. According to Defendants, a "market maker" provides market liquidity by "making trades available to both sides" or, put differently, by placing a bid at one price and an ask at a slightly higher or lower price, thereby earning profit on the spread of the bids and asks. (Case No. 20-cv-04947, Dkt. 29 at 10 & Dkt. 31 at 9; Case No. 20-cv-04948, Dkt. 35 at 10.) According to Defendant John Does A and D, market makers at the CBOE are required to "maintain a continuous two-sided market," meaning that they must maintain bids and asks, and "update quotations in response to changed market conditions." (Case No. 20-cv-04947, Dkt. 29 at 10; Case No. 20-cv-04948, Dkt. 35 at 10.) The defendants explain that, as market makers, they use algorithmic automated systems that place, cancel, and update bid and ask orders to reflect updated pricing information. Because the algorithmic systems that enter their orders must quickly process massive volumes of data, implement risk and trading decisions, and enter orders, they can generate "enormous volumes" of cancelled orders, especially during a period of extreme volatility as on August 24, 2015. (Case No. 20-cv-04947, Dkt. 29 at 10, 21; Case No. 20-cv-04948, Dkt. 35 at 10, 21.) Defendants suggest that the alleged market activity merely reflects a market maker trying to accurately price options and update its trading strategies in a chaotic and evolving market. Moreover, regardless of whether the Court finds it plausible that Defendants were acting as market makers, Defendants maintain that their use of algorithms to rapidly place and cancel orders was lawful.

Plaintiffs dispute that the market activity described in the amended complaints constitutes legitimate "market making" activity, noting that because Defendants remain anonymous, they do not know what their roles were in the market. Beyond this, Plaintiffs claim that Defendants' conduct is

inconsistent with the CBOE's market making regulations, which require that market makers place "continuous electronic bids and offers" and enter them in a "reasonable and orderly manner." (Case No. 20-cv-04947, Dkt. 34 at 18–21 & Dkt. 35 at 11, 15; Case No. 20-cv-04948, Dkt. 39 at 18–21.) In particular, Plaintiffs claim that the gaps between the alleged spoofing bids were "random and much longer than the duration of the bids" and thus could not reflect a market maker updating its prices. (Case No. 20-cv-04947, Dkt. 34 at 18–20 & Dkt. 35 at 11–12; Case No. 20-cv-04948, Dkt. 39 at 18–20.) As to the speed of the trades, Plaintiffs contend that trading on the defendants' orders was "nearly impossible" because the bids were maintained for only milliseconds before being cancelled. (Case No. 20-cv-04947, Dkt. 34 at 21 & Dkt. 35 at 12; Case No. 20-cv-04948, Dkt. 39 at 21.) Plaintiffs state that "many" of the bids entered by John Does A and D could not have been executed, and Kessev Tov appears to suggest that all of the bids entered by John Doe B could not have been executed. (*Id.*)

At bottom, Plaintiffs have alleged that Defendants engaged in market manipulation because they entered—and quickly cancelled—orders to buy and sell. The complaints allege that Defendants' manipulation is evident in the "well-defined pattern and speed of placing these bids" and the "frequency, speed, and precision with which the bidding took place evidences a highly orchestrated plan to deceive." (Case No. 20-cv-04947, Dkt. 25 at 6–7, ¶ 16; Case No. 20-cv-04948, Dkt. 24 at 6–7, ¶ 15.) In the case of John Does A and D, the complaints place the volumes of simultaneous bids and asks in a range of 12 to 83, while for John Doe B, the range was 3 to 7. (*See generally* Case No. 20-cv-04947, Dkt. 25; Case No. 20-cv-04948, Dkt. 24.) The only "pattern" apparent from the face of the complaints is that of rapidly placed and subsequently cancelled orders.

But placing rapid orders and cancelling them does not necessarily evince illegal market activity. Other courts have recognized the ubiquity of rapid trading across securities platforms. For example, in *United States v. Coscia*, 866 F.3d 782, 785 (7th Cir. 2017), the Seventh Circuit described

17

this "new trading environment" in the commodities markets, in which "trading takes place on digital markets where the participants utilize computers to execute hyper-fast trading strategies at speeds, and in volumes, that far surpass those common in the past."  None of the parties contend that rapidly cancelling orders, in and of itself, is illegal.

To be sure, Plaintiffs are correct that illegality is not necessarily required in a claim for market manipulation.  "Market manipulation can be accomplished through otherwise legal means . . . such as short sales, and large or carefully timed purchases or sales of securities."  *CP Stone I*, 2016 WL 5934096, at *5.  Plaintiffs contend that, even if otherwise legal, the "frequency, speed, and precision with which the bidding took place evidences a highly orchestrated plan to deceive."  (Case No. 20-cv-04947, Dkt. 25 at 7, ¶ 16; Case No. 20-cv-04948, Dkt. 24 at 7, ¶ 15.)  This case bears some similarity to *CP Stone I* in that regard.  *CP Stone I*, 2016 WL 5934096, at *2.  In *CP Stone I*, the court concluded that the plaintiff's theory "boil[ed] down to an allegation that if a subset of orders was ultimately cancelled, those orders, in hindsight, must never have been intended to be executed."  *Id.* at *6 (internal quotations omitted).[6]  Here, Plaintiffs' theory ostensibly goes one small step further: if Defendants' orders were *quickly* cancelled, they must never have been intended to be executed.

Coupled with Plaintiffs' quick-cancellation theory is the claimed ripple effect that led Plaintiffs to have to purchase the options "well outside the rational price for [those] option[s] based

---

[6] Less than three weeks after the court granted the defendant's motion to dismiss, the plaintiff moved for leave to file an amended complaint, which the court granted.  The court found that the amended complaint had adequately pleaded manipulative conduct because "by alleging a pattern of essentially parking the Deceptive Orders behind legitimate but much smaller orders, [plaintiff] ha[d] sufficiently alleged that defendants ha[d] both injected inaccurate information into the market, created a false impression of market activity, and had an illegal intent."  *CP Stone Fort Holdings, LLC v. Doe(s)*, No. 16 C 4991, 2017 WL 1093166, at *3–4 (N.D. Ill. Mar. 22, 2017) (Gettleman, J.) (hereinafter, "*CP Stone II*").  The court in *CP Stone II* noted that the amended complaint had "identified actions taken by defendants to ensure (as much as possible) that the Deceptive Orders would not be executed," which included placing the allegedly deceptive orders in a queue behind, on average, $27 million in existing orders.  *Id.* at *3.  Ultimately, the court granted the defendant's motion to dismiss for failure to allege loss causation, and plaintiff moved for reconsideration.  Based on the plaintiff's argument that its failure to plead loss causation was curable, the court granted leave to file a second amended complaint to add allegations on that issue.  After the court denied a subsequent motion to dismiss that complaint, defendant moved for leave to appeal. The parties eventually settled, and plaintiff voluntarily dismissed the case as to all defendants.

on [their] fundamental characteristics." (Case No. 20-cv-04947, Dkt. 25 at 6, ¶ 15; Case No. 20-cv-04948, Dkt. 24 at 6, ¶ 14.) But the amended complaints are too conclusory on both points above. Plaintiffs fail to allege sufficient facts underpinning their allegations that (a) the cancelled orders demonstrate a plan to deceive, and (b) that the resulting midpoint prices—in the middle of a period of extreme market volatility—were fundamentally irrational.

Plaintiffs allege that Defendants lured them into selling option contracts below or buying option contracts above "what would otherwise be the prevailing market price." (Case No. 20-cv-04947, Dkt. 25 at 5, ¶ 12; Case No. 20-cv-04948, Dkt. 24 at 5, ¶ 11.) But they haven't alleged any facts to establish what the "prevailing market price" would have been for the options involved in the at-issue transactions. The allegations are simply too light on facts. *See, e.g.*, *Ploss*, 197 F. Supp. 3d at 1068 (holding that manipulation claim under Section 9(a)(2) of the Commodities Exchange Act failed to "adequately say (with *factual* allegations, rather than conclusions) that there were artificial prices, nor [wa]s there information about *how* the prices were artificial"). Here, Plaintiffs claim that they have provided far more detail than that put forth in *Ploss*, as the amended complaints allege that Defendants' spoofing scheme caused the prices of S&P 500 options to increase "such that they decoupled from the fundamental characteristics of the underlying security, on which an option is typically priced." (Case No. 20-cv-04947, Dkt. 34 at 23 & Dkt. 35 at 13–14; Case No. 20-cv-04948, Dkt. 39 at 23.) But Plaintiffs' claim that the option prices decoupled from the underlying security's fundamental characteristics is still conclusory, despite being adorned with more technical language. At best, the complaints allege that the defendants' spoofing caused Plaintiffs to purchase contracts to close their positions "at a price higher than the price that prevailed at any period for the remainder of the day following the cessation of [the defendants'] spoofing." (*See, e.g.*, Case No. 20-cv-04947, Dkt. 25 at 11, ¶ 31; Case No. 20-cv-04948, Dkt. 24 at 9, ¶ 21.) Plaintiffs ostensibly ask the Court to conclude that purchasing an option at the highest price for a given day—while in the midst

of an admitted "flash crash"—is an irrational price. Merely labeling prices "irrational" because they were higher during a period of volatility does not make them irrational. *CP Stone I*, 2016 WL 5934096, at *6 ("As defendant argues, however, just calling an order deceptive does not make it so.").

Because the complaints fail to allege manipulative conduct, Plaintiffs' manipulation claims under Section 10(b) and the ISL fail.[7] The Court thus need not assess whether scienter or loss causation have been met or reach Defendant John Does A and D's additional arguments regarding Plaintiffs' ISL claims. Finally, Defendant John Does A and D's request to remain anonymous unless and until their motion to dismiss was denied is stricken as moot.

**Conclusion**

Based on the foregoing discussion, the Court grants Defendants John Does A and D's motions to dismiss without prejudice (Dkt. 28 in Case No. 20-cv-04947) and (Dkt. 36 in Case No. 20-cv-04948) and Defendant John Doe B's motion to dismiss without prejudice (Dkt. 30 in Case No. 20-cv-04947). If Plaintiffs believe that they can adequately replead their claims to cure the deficiencies addressed in this opinion, they may do so within 30 days.

IT IS SO ORDERED.

Date: 06/30/2022

Entered: _____

SHARON JOHNSON COLEMAN
United States District Judge

---

[7] In reaching its decision, the Court need not decide the precise degree of heightened pleading standard applicable to market manipulation claims, *see supra* Note 4, as it would reach the same result regardless.